UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
CASE NO. _____-CIV____

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

GLOBETEL COMMUNICATIONS CORP.,
TIMOTHY J. HUFF, THOMAS Y. JIMINEZ
and LAWRENCE E. LYNCH

      Defendants.



08-60647

CIV-MARTINEZ

MAGISTRATE JUDGE BROWN

FILED BY _____ D.C.

MAY - 1 2008

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") alleges as follows:

## NATURE OF THE ACTION

1.    The Commission brings this action against GlobeTel Communications Corp. ("GlobeTel" or the "company") and three former officers for violations that span more than five years and include fraud and the unregistered sale of more than $1.6 million in stock. These violations involved one scheme to fraudulently inflate GlobeTel's revenue and then hide millions of dollars in unpaid bills, and another scheme to sell GlobeTel stock in order to pay some of the individuals who were responsible for the fraudulent inflation of GlobeTel's revenue.

2.    The fraud continued from 2004 to 2006 during which time the two individuals, Joseph J. Monterosso ("Monterosso") and Luis E. Vargas ("Vargas"), who ran GlobeTel's wholesale telecommunications ("telecom") business created $119 million in fake invoices that

appeared to reflect transactions between telecom companies and three of GlobeTel's wholly-owned subsidiaries. These invoices falsely created the appearance that GlobeTel's subsidiaries were buying and selling telecom "minutes" at no profit. In reality, GlobeTel and its subsidiaries never bought or sold anything under what was referred to as the "off-net" revenue program.

3.      Neither GlobeTel nor its subsidiaries ever paid the invoices supposedly sent by the suppliers, and neither GlobeTel nor its subsidiaries ever received payment from the customers to whom invoices were supposedly sent.

4.      As a result of the fake invoices that GlobeTel received, millions of dollars in unpaid bills accumulated on GlobeTel's books each quarter. If GlobeTel had permitted millions of dollars in unpaid accounts receivable and unpaid liabilities to remain on its books, it would have created the appearance that GlobeTel's customers had failed to pay their bills and that GlobeTel had never paid millions of dollars to its suppliers. GlobeTel never had enough cash to pay the "off-net" invoices.

5.      GlobeTel never disclosed the unpaid bills accumulating on its books because two GlobeTel executives, Thomas Y. Jiminez ("Jiminez") and Lawrence E. Lynch ("Lynch"), each of whom served as the company's chief financial officer, eliminated the millions of dollars in unpaid bills by making, or causing to be made, entries in GlobeTel's general ledger that set off the receivables attributable to the "off-net" revenue program against the liabilities attributable to that program. The set off of the receivables and liabilities associated with the "off-net" revenue program was made without any basis, was inconsistent with generally accepted accounting principles ("GAAP") and had the effect of concealing the on-going fraud from investors.

2

Additionally, Lynch and Jiminez were aware of numerous warning signs ("red flags") that alerted them that "off-net" invoices were suspicious.

6.      As a direct result of defendants' scheme, GlobeTel issued periodic reports, registration statements and press releases that misled investors because they materially misstated GlobeTel's financial results for at least the period from the third quarter of 2004 through the second quarter of 2006.  In order to pay Monterosso and Vargas for the fake invoices they created, GlobeTel sold about $1.6 million in stock through unregistered sales.  Timothy J. Huff ("Huff"), GlobeTel's CEO, accomplished these unregistered sales by causing one of GlobeTel's subsidiaries to sell GlobeTel stock and transfer the proceeds to GlobeTel.  Those sales violated the securities laws as discussed below.

7.      The SEC brings this action based upon violations of the securities law that the defendants committed in furtherance of these schemes.  In addition, GlobeTel also violated the securities laws by making false filings or by failing to make required filings from 2002 to 2006, including the failure to account properly for so-called sales of software and networks in 2002 and the failure to properly account for the purchase of private businesses in 2004 and 2005.

## JURISDICTION AND VENUE

8.      The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].  The defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the acts, transactions, practices and courses of business alleged herein.

9.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

## ISSUER AND CORPORATE DEFENDANT

10.     **GlobeTel Communications Corp.** ("GlobeTel") is a Delaware corporation with a headquarters in Fort Lauderdale, Florida.  Until February 2007, its headquarters was located in Pembroke Pines, Florida.  At all relevant times, the common stock of GlobeTel was registered pursuant to Section 12 of the Exchange Act.  Its shares traded on the American Stock Exchange ("AMEX") from in or about May 2005 until the AMEX delisted the company on October 11, 2006.  Before and after trading on the AMEX, GlobeTel's shares were listed over-the-counter on the Pink Sheets.

11.     GlobeTel purported to be in a number of businesses from 2002 to 2006, including the development of an airship to broadcast telecommunications to entire cities and the installation of $600 million in wireless networks in Russia.

12.     As part of its efforts to join the AMEX, GlobeTel initiated a 1 for 15 reverse stock split on May 23, 2005.

13.     GlobeTel's independent auditor from 2002 through 2006 was Dohan & Co., a Miami firm that GlobeTel dismissed on January 4, 2007.

14.     On October 6, 2006, GlobeTel issued a press release to announce that its audit committee had authorized an internal investigation concerning accounting issues raised by the Commission.  GlobeTel hired a law firm to conduct the investigation, but by about December

4

2006, GlobeTel had stopped the investigation. GlobeTel later hired an accountant as its interim chief financial officer who resigned in March 2007.

15.     On November 15, 2006, GlobeTel announced in a Form 12b-25 filed with the Commission that it would not file its Form 10-Q for the third quarter of 2006 in light of issues raised by the Commission's investigation. GlobeTel has not filed a quarterly or annual report for any period after June 30, 2006.

16.     On May 8, 2007, the company announced in a Form 8-K filed with the Commission that it expected to restate its financial statements from 2004 to 2006, including a restatement of revenue related to its wholly-owned subsidiary, Centerline Communications, LLC ("Centerline"). On June 29, 2007, the company announced in a Form 8-K filed with the Commission that it expected the restatement would involve the elimination of about $120 million in revenue and about $9.9 million in intangible assets.

17.     On November 2, 2007, the company filed a restated Form 10-KSB for 2004 in which the company reduced its annual revenue by $17.68 million, reduced its assets by $2.778 million, and increased its net loss by $2.778 million. On December 5, 2007, the company filed a restated Form 10-K for 2005 in which the company reduced its annual revenue by $70.99 million, reduced its assets by $9.9 million, and increased its net loss by $9.9 million.

## INDIVIDUAL DEFENDANTS

18.     **Timothy M. Huff**, 42, has his primary residence in Broward County, Florida. He was GlobeTel's chief executive officer ("CEO") and a director from April 2002 until September 2006, when he became the company's chief technology officer. As CEO, Huff oversaw the

operations of the entire company. Huff left GlobeTel in March 2007, although he continued to function as a consultant to the company.

19.    **Thomas Y. Jimenez**, 48, has his primary residence in Broward County, Florida. He was chief financial officer ("CFO") of GlobeTel and its predecessor from October 1999 until April 2006, when he retired. As CFO, he oversaw all accounting functions and GlobeTel's financial reporting, including financial reports included in GlobeTel's filings with the Commission. Jimenez is a CPA licensed in New York, although the license has lapsed. Jimenez signed four quarterly reports and two annual reports filed with the Commission from August 2004 to March 2006.

20.    **Lawrence E. Lynch**, 56, has his primary residence in Broward County, Florida. He was chief operating officer ("COO") of GlobeTel from 2004 to March 31, 2006 when he became the company's acting CFO. GlobeTel terminated him in October 2006 while Monterosso was GlobeTel's COO after Lynch complained to the board of directors about Monterosso's claims that GlobeTel was profitable. Lynch has an MBA with a focus in managerial accounting.

21.    As COO, Lynch had responsibility for Centerline, including the financial reporting of transactions with vendors and customers. Lynch helped design the financial controls at Centerline and implemented some controls on transactions in which telecom traffic was actually routed through a GlobeTel-controlled telecom switch, which some GlobeTel executives described as "on-net" transactions.

6

22.     As CFO, Lynch oversaw all accounting functions and GlobeTel's financial reporting, including financial reports included in GlobeTel's filings with the Commission. Lynch signed two quarterly reports filed with the Commission in May and August 2006.

### ADDITIONAL GLOBETEL OFFICER

23.     **Joseph J. Monterosso**, age 52, has his primary residence in Broward County, Florida.   In the summer of 2004, Monterosso began working for GlobeTel as a contractor running GlobeTel's Centerline subsidiary, and in about May 2005, was hired as president of Centerline.   Throughout this time period, he reported directly to GlobeTel's CEO, supervised Centerline's employees, negotiated all wholesale telecom contracts, and ran the entire wholesale telecom business.   In July 2006, Monterosso began serving as GlobeTel's COO, and he served in that position until he was terminated by GlobeTel in May 2007.

### PART I – THE "OFF-NET" REVENUE FRAUD

**A.     IN 2004, GLOBETEL ENTERED AN AGREEMENT WITH MONTEROSSO TO GENERATE ADDITIONAL WHOLESALE TELECOM REVENUE**

24.     In 2004, GlobeTel wished to expand the volume of telecom traffic Centerline carried and the amount of revenue it generated, and, to that end, Huff entered into negotiations with Monterosso, who had extensive experience in the wholesale telecom business.   Monterosso and his brother owned and operated a telecom switch in Los Angeles, California, and Vargas, who was Monterosso's bookkeeper, had started his own telecom company, Carrier Services, Inc. ("CSI"), utilizing Monterosso's switch.   Monterosso handled all negotiations for CSI and often held himself out as the head of the company.

7

25.     Wholesale telecom companies make money by connecting people who want to make telephone calls or other electronic transmissions with companies whose networks have access to the location the customers wish to call. Using "switches" that are either large computer arrays or cable connections, wholesale telecom companies pay by the minute for the right to connect telephone calls to other companies' networks and sell that "termination" service to their customers. A wholesale telecom company's profit is based upon the spread between the price paid to the vendors who provide the termination service and the price it charges its customers for access to the termination service.

26.     Huff and Monterosso negotiated a "joint venture" agreement between GlobeTel and CSI pursuant to which CSI would operate Centerline. The purpose of this agreement was "to build telecommunications revenue and client base, utilizing each party's network and financial resources . . . ."

27.     The agreement between GlobeTel and CSI provided that Centerline was to generate $50 million in revenue per year and be profitable in its first year of operation, in return for which CSI would receive $1 million of GlobeTel's publicly-traded stock. If Centerline generated $50 million in revenue in the second year of operations, CSI would receive an additional $1 million of GlobeTel's stock.

28.     Shortly after CSI entered the joint venture agreement with GlobeTel, Monterosso re-negotiated the agreement with Huff to provide that CSI was only required to generate $25 million in profitable revenue for Centerline, which would result in CSI receiving 5 million (333,333 post-split) shares of GlobeTel's publicly-traded stock. There was no provision in the

8

agreement for compensating either Monterosso or Vargas if the minimum revenue goal of $25 million was not achieved.

29.     GlobeTel reported that CSI had achieved the joint venture agreement's $25 million revenue goal in January 2005 and, therefore, was entitled to receive 5 million shares of GlobeTel's publicly-traded stock.

30.     In or about March 2005, Huff and Monterosso negotiated another agreement under which CSI would receive one million shares of GlobeTel's restricted stock if it was able to generate $10 million in revenue for Centerline.  On May 15, 2005, Monterosso reported to GlobeTel that Centerline had achieved the $10 million revenue goal.

**B.      MONTEROSSO WAS UNSUCCESSFUL IN GENERATING REVENUE THROUGH "PARTNER AND INCENTIVE AGREEMENTS"**

31.     GlobeTel's agreement with Monterosso and CSI envisioned that revenue would be generated for Centerline as a result of "Partner and Incentive Agreements" with other wholesale telecom companies.  Beginning in about July 2004, Monterosso tried to convince other telecom companies to enter into "Partner Incentive and Financing Agreements" and shift their wholesale telecom traffic to Centerline.  Specifically, Monterosso sought to have other telecom companies route their telecom traffic through the switch in Los Angeles that he owned and which he allowed CSI to use.

32.     Monterosso did successfully negotiate three "Partner Incentive and Financing Agreements" for Centerline.  However, none of these "partners" ever did any "off-net" business with Centerline or any of its subsidiaries.

9

33.     In March 2005, GlobeTel reported that Centerline and its subsidiaries had entered into "Partner Incentive and Financing Agreements" with companies that provided wholesale telecom services "to produce profitable revenues using the Calling Services of the partners for an initial period of two (2) years."

C.     **THE "OFF-NET" REVENUE PROGRAM**

34.     Because Centerline was unable to generate sufficient revenue through partner incentive and financing agreements, in or about October 2004, Monterosso, Vargas and GlobeTel executives devised an "off-net" revenue program.  The "off-net" program was different from the "Partner Incentive and Financing Agreements" that were part of the original "joint venture" agreement.  GlobeTel employees called this revenue "off-net" to distinguish it from "on-net" transmissions that actually passed through GlobeTel's telecom switch in Los Angeles.  However, GlobeTel never distinguished between "off-net" and "on-net" revenue in its filings with the Commission or in its press releases.

35.     From 2004 to 2006, Monterosso and Vargas, at Monterosso's direction, provided GlobeTel's finance department with hundreds of invoices that purported to show $119 million in "off-net" sales and an approximately equal amount of purchases.  The hundreds of "off-net" invoices that GlobeTel's finance department received from Monterosso and Vargas appeared to show transactions between three GlobeTel subsidiaries, Centerline, Volta Communications, LLC ("Volta"), and Lonestar Communications, LLC ("Lonestar"), and five other telecom companies.

36.     The "off-net" sales were accompanied by hundreds of invoices supposedly showing "off-net" purchases from vendors, so the overall effect on GlobeTel's net income or profit was generally negligible.  However, GlobeTel touted its overall revenue in many press

10

releases from mid-2004 to mid-2006, including press releases on Sept. 28, 2004, Oct. 13, 2004, March 31, 2005, and May 16, 2005.

37.     In order to record revenue, GlobeTel's finance department required documents to substantiate the amount of sales and cost of goods sold.  With respect to revenue generated by Centerline, the accountants who worked directly or as consultants for GlobeTel asked Monterosso and Vargas for the invoices sent to customers and received from vendors and for "call detail records" ("CDRs").  CDRs are technical documents that record information, such as the date, length, origin and destination for each telephone call.  In this respect, a CDR is similar to a large telephone bill that documents all the telephone calls that are placed through a "switch."

38.     Monterosso and Vargas knew that GlobeTel could not record revenue generated by Centerline's "off-net" telecom business without invoices and CDRs to substantiate that Centerline and its wholly owned subsidiaries actually engaged in the telecom transactions that were the basis for the revenue they reported.

### D.     ALL THE "OFF-NET" REVENUE WAS FICTITIOUS

39.     GlobeTel's subsidiaries, Centerline, Volta, and Lonestar, conducted no business as part of these "off-net" transactions.  They bought nothing and sold nothing.  In fact, Volta and Lonestar never conducted any business at all.  Therefore, all of Centerline's "off-net" revenue was fictitious.

40.     All the "off-net" invoices Monterosso and Vargas, at Monterosso's direction, created from 2004 to 2006 were false.  They were false because they created the false impression that Centerline, Volta and Lonestar were buying and selling "minutes" with other wholesale

11

telecom companies. In total, these fake invoices appeared to record $119 million in "off-net" revenue.

41.    As part of this scheme, Monterosso and Vargas created invoices that appeared to have been generated by two private companies where they did not work, XSTEL and World Communication Carrier Services ("WCCS"). These invoices purported to record sales by those companies to Volta and Lonestar. They also created invoices on Volta and Lonestar letterhead that appeared to record sales to private companies, Mercury Telecom ("Mercury") and Telmetriks. Although Monterosso and Vargas knew who owned XSTEL, Mercury Telecom, WCCS and Telmetriks, they did not provide the owners with copies of the invoices that appeared to be sent by or to their companies.

42.    Between September 2004 and June 2006, Monterosso and Vargas also generated false CDRs to support the fictitious $119 million in "off-net" revenue contained in the false invoices. The CDRs were false because they did not record any calls that involved Centerline, Volta or Lonestar even though Monterosso and Vargas held them out as recording the calls listed in the "off-net" invoices.

43.    Monterosso and Vargas, at Monterosso's direction, provided the false invoices along with the false CDRs to GlobeTel's accountants, knowing that those accountants would provide them to GlobeTel's auditors. Although the invoices generally covered seven-day periods, it was Vargas' regular practice to provide invoices for extended periods of time, on some occasions not until after, or near, the end of the quarter.

44.    Between mid-2004 and mid-2006, Monterosso and Vargas, at Monterosso's direction, submitted invoices to GlobeTel that gave the false appearance that Centerline bought

telecom "minutes" worth about $34.31 million from CSI and sold an equivalent amount of "minutes" to CSI.

45.     Between mid-2004 and mid-2006, Monterosso and Vargas, at Monterosso's direction, submitted invoices to GlobeTel that gave the appearance that Volta bought telecom "minutes" worth about $30.3 million from WCCS and sold an equivalent amount of telecom "minutes" to Mercury.

46.     Between mid-2004 and mid-2006, Monterosso and Vargas, at Monterosso's direction, submitted invoices to GlobeTel that gave the false appearance that Lonestar bought telecom "minutes" worth about $55.15 million from XSTEL and sold an equivalent amount of telecom "minutes" to Telmetriks.

**E.     THE SET OFF OF ACCOUNTS RECEIVABLE AND LIABILITIES RELATED TO THE "OFF-NET" REVENUE PROGRAM**

47.     Jimenez and Lynch made or caused to be made entries in GlobeTel's general ledger based on the "off-net" invoices provided by Monterosso and Vargas, at Monterosso's direction, that caused GlobeTel to record and report about $119 million in revenue and cost of goods sold. They did this despite their knowledge of the red flags discussed below.

48.     Jimenez, Lynch and their employees in GlobeTel's finance department used the fake "off-net" invoices that appeared to have been issued by Centerline, Volta and Lonestar to their customers to record revenue and the fake invoices that appeared to have been issued to Centerline, Volta and Lonestar from their vendors to record the cost of goods sold in GlobeTel's books. They also used the fake invoices to enter the amount of the sale or purchase and the name of the company that bought from or sold to GlobeTel's subsidiaries in GlobeTel's books.

13

49.     When GlobeTel's finance department employees recorded the revenue on the company's books, they also recorded an equivalent amount of accounts receivable to reflect money owed to GlobeTel's subsidiaries by their customers.  When GlobeTel's finance department employees recorded the cost of goods sold on the company's books, they also recorded an equivalent liability to reflect money owed by GlobeTel's subsidiaries to their suppliers.  These entries were standard accounting in accordance with GAAP.

50.     Because the "off-net" invoices were fake, GlobeTel's subsidiaries did not pay their supposed suppliers CSI, WCCS and XSTEL, and their supposed customers CSI, Mercury and Telmetriks did not pay GlobeTel's subsidiaries.  Consequently, at the end of every quarter between mid-2004 and mid-2006, GlobeTel's books reflected millions of dollars in accounts receivable and an equal amount of liabilities.

51.     If GlobeTel had reported that it had millions of dollars in unpaid accounts receivable and unpaid liabilities on its books, it would have created the appearance that GlobeTel's customers had failed to pay their bills and that GlobeTel had never paid millions of dollars to its suppliers.  GlobeTel never had enough cash to pay the liabilities that it recorded as a result of the "off-net" invoices.

52.     From in or about October 2004 until each man left the company, Jimenez and Lynch made, or caused to be made, entries in GlobeTel's general ledger that set off accounts receivable attributable to the "off-net" revenue program against liabilities attributable to the "off-net" revenue program.  By making the off-setting entries at or after the end of each quarter, Jimenez and Lynch caused GlobeTel to report relatively steady accounts receivables and liabilities – never exceeding $2.58 million and $9.9 million respectively.

14

53.     There was no contract with or correspondence from Centerline's "off-net" customers or vendors, or any other basis, that justified Jiminez's and Lynch set off of accounts receivable attributable to the "off-net" revenue program against liabilities attributable to the "off-net" revenue program.

54.     In addition, the set off of entries related to the Volta and Lonestar transactions was inconsistent with Generally Accepted Accounting Principles ("GAAP"), which are standards, rules and conventions that are established by the Financial Accounting Standards Board and other related bodies. Under Commission regulations, financial statements that are filed with the Commission must be prepared in conformity with GAAP.

55.     GlobeTel was required to comply with Accounting Principles Board Opinion No. 10 (APB 10), the GAAP accounting standard pertaining to the set off of accounts receivable against liabilities. APB 10 provides that assets, such as accounts receivable, may only be set off against liabilities when four conditions are met:

     a. Each of two parties owes the other determinable amounts;
     b. The reporting party has the right to set off the amount owed with the amount owed by the other party;
     c. The reporting party intends to set off; and
     d. The right of set off is enforceable at law.

56.     From in or about October 2004 until in or about September 2006, GlobeTel set off a total of approximately $119 million in "off-net" accounts receivable against approximately $119 million in "off-net" liabilities. About $85 million of the off-setting entries related to the transactions supposedly done by Volta and Lonestar. Jimenez and Lynch relied upon the "off-net" invoices to account for those transactions. Those invoices indicated that the transactions involved three parties: a GlobeTel subsidiary (Volta or Lonestar); its supposed customer and its

15

supposed vendor. The off-setting entries that Lynch and Jiminez made or caused to be made involved setting off money Volta allegedly owed WCCS against money Volta was allegedly owed by Mercury. The off-setting entries also included setting off money Lonestar allegedly owed XSTEL against money Lonestar was allegedly owed by Telmetriks.

57.    The set off of entries related to the "off-net" transactions of Volta and Lonestar was inconsistent with GAAP because Jiminez and Lynch had previously recorded or caused GlobeTel to record the "off-net" invoices as bona fide transactions; GlobeTel's subsidiaries did not have a legally enforceable right of set-off; and the debts involved three parties, not two. If Jiminez and Lynch had applied GAAP, as stated in APB 10 and FASB Interpretation No. 39, to the Volta and Lonestar transactions reported to them by Monterosso and Vargas, the amount of accounts receivable and liabilities GlobeTel would have reported would have each exceeded $85 million by August 2006. The understatements for each reporting period were cumulative because no one ever paid the balances due. Consequently, the understatement in each quarter was the sum of all past understatements plus the alleged new revenue from Lonestar and Volta in that quarter.

58.    Lynch personally made the off-setting entries during 2004, and from 2005 until he was terminated, he directed finance department employees to make them. Lynch knew that, with respect to the "off-net" program, Centerline, Volta and Lonestar did not pay their vendors and did not get paid by their customers. Lynch discussed the entries relating to the "off-net" program with Jimenez, who was responsible for GlobeTel's accounting as its CFO until March 31, 2006. However, neither Jimenez nor Lynch discussed the off-setting entries with GlobeTel's auditors or with an accounting consultant who helped draft GlobeTel's public filings.

16

59.     In the summer of 2005, GlobeTel hired a controller, who reported to Jimenez. The controller discussed the off-setting entries with both Lynch and Jiminez.  At some point, while he was still employed at GlobeTel, Lynch told the company's controller that they needed to set off the liabilities and accounts receivables associated with the "off-net" revenue because GlobeTel was never going to receive payments.  Lynch and Jimenez told the controller that the off-setting entries were consistent with industry practice.  Upon information and belief, the entries were not consistent with industry practice or GAAP.

60.     Because of actions by Jimenez and Lynch, GlobeTel never disclosed that neither its subsidiaries nor its subsidiaries' alleged customers were paying the millions of dollars in bills associated with the "off-net" transactions.  Therefore, the set off of accounts receivable against liabilities concealed from investors the existence of unpaid bills.

61.     Jimenez and Lynch knew or were reckless in not knowing that the setting off of liabilities against accounts receivable attributable to the "off-net" revenue program was improper because there was no basis for the set offs and because it was inconsistent with GAAP.  Jimenez and Lynch knew that the off-setting entries in the general ledger would cause GlobeTel to report lower accounts receivables and liabilities in periodic reports and registration statements because it is general practice to use entries in the general ledger to create the financial statements in those reports and statements.

62.     Upon information and belief, the following chart depicts the magnitude of the set offs made or caused to be made by Jiminez and Lynch and thus the magnitude of the unpaid bills hidden from investors in GlobeTel's filings with the Commission.  The chart also depicts the revenue GlobeTel reported each quarter and the CFO who signed the filing:

17

| Period | Date of filing with the Commission | CFO who signed the filing | Reported revenue ($000,000) | Current quarter's set offs from Volta and Lonestar ($000,000) | Cumulative total of set offs from Volta and Lonestar ($000,000) |
|--------|-----------------------------------|---------------------------|----------------------------|--------------------------------------------------------------|----------------------------------------------------------------|
| Q3 2004 | Nov. 15, 2004 | Jimenez | $7.50 | $2.21 | $2.21 |
| Q4 2004 | Mar. 31, 2005 | Jimenez | $14.48 | $8.74 | $10.95 |
| Q1 2005 | May 16, 2005 | Jimenez | $18.01 | $10.58 | $21.53 |
| Q2 2005 | Aug. 12, 2005 | Jimenez | $19.70 | $11.28 | $32.81 |
| Q3 2005 | Nov. 14, 2005 | Jimenez | $22.29 | $13.51 | $46.32 |
| Q4 2004 | Mar. 31, 2006 | Jimenez | $21.13 | $13.39 | $59.61 |
| Q1 2006 | May 12, 2006 | Lynch | $22.94 | $13.52 | $73.13 |
| Q2 2006 | Aug. 14, 2006 | Lynch | $21.62 | $12.25 | $85.38 |

## F.   THROUGHOUT THE "OFF-NET" PROGRAM, GLOBETEL'S EXECUTIVES KNEW OF IRREGULARITIES IN THE "OFF-NET" INVOICES AND CDRS

63.     During the existence of the "off-net" revenue program Jimenez and Lynch were aware – at a minimum – of red flags that alerted them that the invoices submitted by Monterosso and Vargas did not represent actual telecom business conducted by Centerline.

64.     Jimenez and Lynch made and approved the journal entries that recorded revenue and the journal entries that concealed unpaid bills, as discussed above, even while they were aware of the following red flags concerning the "off-net" revenue program.

### 1.     GlobeTel's Subsidiaries Did Not Pay Their "Off-Net" Vendors Or Get Paid By Their "Off-Net" Customers

65.     Jimenez and Lynch were responsible for monitoring collections and payments to vendors as well as managing GlobeTel's cash. They knew that GlobeTel's subsidiaries did not pay their "off-net" vendors or get paid by their "off-net" customers, and they knew that no one complained when they unilaterally wrote off millions of dollars in liabilities that GlobeTel's subsidiaries supposedly owed its vendors.

18

66.     The failure of GlobeTel's subsidiaries to pay their vendors was extremely unusual in the wholesale telecom industry where companies, including GlobeTel and its subsidiaries, normally pre-pay for traffic or sign credit contracts.  Although GlobeTel and its subsidiaries either pre-paid vendors or signed credit contracts in its "on-net" telecom business, they did neither in their "off-net" business.

## 2.     In At Least One Quarter, Monterosso And Vargas Created Invoices And Revenues After The Quarter Had Closed

67.     As part of the deal negotiated with GlobeTel in March 2005, Monterosso and Vargas were to deliver $5 million in telecom revenue in the first quarter of 2005, which ended March 31, 2005.

68.     GAAP requires that revenue be recognized when earned.  Consequently, GlobeTel would violate GAAP if it recorded revenue in its first quarter based upon business conducted in April or May 2005.

69.     Between April 5 and 21, 2005, Monterosso and Vargas sent multiple emails and reports to Huff and Lynch stating they would deliver $5 million of revenue for the completed first quarter.

70.     On or about April 27, 2005, a GlobeTel executive asked Monterosso whether he could provide an additional $1.6 million worth of revenue for GlobeTel's first quarter.  The GlobeTel executive who requested the extra revenue said that he wanted the $1.6 million so GlobeTel could report what he believed were "proper revenue growth scales," because he believed that too much revenue was going to fall into the second quarter.

71.     On or about April 27, 2005, Vargas sent Lynch and Jimenez a spreadsheet showing weekly revenue amounts purportedly from early February through March – totaling $5.03 million under the heading "Original Revenue-Actual" and an additional $1.6 million under the heading "Additional $1.6 million."

72.     In early May 2005, Monterosso notified Huff, Jimenez and Lynch that he would deliver extra revenue for the first quarter by creating invoices based upon CDRs that he had received from another carrier.

73.     In May 2005, Vargas sent Lynch a set of invoices that appeared to report purchases and sales from early February to late March 2005. These additional invoices added up to about $1.6 million.

74.     GlobeTel recorded an additional $1.6 million in revenue in the first quarter of 2005, based upon invoices GlobeTel requested in April 2005 that it did not receive until May 2005, even though the invoices purported to report purchases and sales in February and March 2005. The $1.6 million accounted for almost nine percent of GlobeTel's revenue for the first quarter of 2005.

### 3.     Monterosso And Vargas Provided "Off-Net" Invoices At The End Of Each Quarter

75.     Jimenez and Lynch knew that Monterosso and Vargas usually provided GlobeTel off-net invoices for extended periods of time, on some occasions not until after, or near, the end of the quarter. In contrast, invoices related to "on-net" telecom transactions generally were created and provided to GlobeTel by Monterosso and Vargas within days of the transmission to be billed.

76.     In August 2005, GlobeTel's controller asked Vargas for an estimate of off-net revenues to date for the third quarter of 2005.  Vargas responded to the request by sending Lynch and the controller a list of revenue for the prior four weeks, stating that his list "does not take into account should additional revenue be requested in which case these amounts will definitely change."

77.     In response to the August 2005 request for an estimate of off-net revenue, Monterosso sent an email to Jimenez, Lynch and the controller, suggesting that GlobeTel delay its requests for vendor invoices in case it wanted to add more revenue:

> If we ask the vendors to provide exact invoices we will not be able to add to them later in the event that additional off-net revenue is needed.  In the past we have provided invoices and CDRs at the end of the quarter.  I am concerned that we will back ourselves into a corner before the end of the quarter.

### 4.     Monterosso Said He Was Paying Other Companies For Their Invoices And CDRs

78.     Monterosso repeatedly told Huff, Jiminez and Lynch that he was paying other companies to obtain invoices and CDRs – as opposed to paying them to transmit telecom communications.  On October 4, 2004, Monterosso told Huff, Jimenez and Lynch that he had "assist[ed] the quarter's revenues" by obtaining invoices from a California businessman, Ron Hay: "Ron Hay was gracious enough to let me use his invoices and customers the past few weeks to assist in the quarter's revenues."

79.     In July 2005, after Monterosso had become president of Centerline, Monterosso asked Jimenez about getting extra compensation for revenue that he provided.  When Jimenez recommended against asking Huff for more money, Monterosso reminded Jimenez that he was "paying cash for the use of the customers and CDRs."

### 5. The "Off-Net" Transactions Occurred Even While The Los Angeles Switch Was Disassembled And Being Moved to a New Location

80.     Jimenez and Lynch knew that GlobeTel shut down the Los Angeles telecom switch near the end of 2004 to move it to a new building and that it did not become operational again until about June 2005. They also knew that no telecom traffic was run on the Los Angeles switch during the months that it took to disassemble and move the computer and other equipment. During this same time period, Monterosso and Vargas reported "off-net" revenue that Jiminez and Lynch recorded for GlobeTel.

### 6. GlobeTel Treated The "Off-Net" Revenue Separately From Its Other Business

81.     Throughout 2004 to 2006, the "off-net" revenue was discussed in separate reports sent to GlobeTel executives.

82.     "Off-net" revenue  was normally not recorded until after the end of a reporting period.

83.     "Off-net" transactions generally involved no profit because identical revenue and cost of goods sold associated with these transactions were reported to GlobeTel.

### G. GLOBETEL FALSELY CLAIMED THAT REVENUE WAS CREATED BY "PARTNER" AGREEMENTS AND FAILED TO DISCLOSE ITS SIGNIFICANT CUSTOMERS AND RELATED-PARTY TRANSACTIONS

84.     As the "off-net" revenues rose, GlobeTel's filings with the Commission explained the source of the revenue was "partner" agreements with other telecom companies. In a Form 10-KSB filed on March 31, 2005, and in a Form 10-K filed on March 31, 2006, GlobeTel explained that Centerline's partners  provided profitable revenue using "a proprietary call

processing platform, technologies, software and other equipment." Both filings were signed by Huff and Jiminez.

85.     GlobeTel's description of the deals that allegedly created revenue for Centerline were similar to the "partnership" agreements that Monterosso had attempted, with only limited success, to get other companies to sign when he first started working with GlobeTel in 2004. However, GlobeTel was aware that no one ever did any business with GlobeTel's subsidiaries under any of those partnership agreements. GlobeTel implemented the "off-net" program after Monterosso's industry contacts rejected the partnership proposals. In the Form 10-K filed on March 31, 2006, GlobeTel acknowledged that all Centerline's "partner" agreements were terminated in February 2005.

86.     Centerline's subsidiaries had no contract with Mercury, WCCS, XSTEL or Telmetriks, and Centerline had no contract with CSI for the purchase and sale of telecom minutes under the "off-net" program.

87.     None of GlobeTel's filings disclosed that: the source of the bulk of GlobeTel's revenue was the "off-net revenue" program; Monterosso was paying for invoices and CDRs; or that Monterosso was creating some revenue after the end of a quarter. Further, none of the filings disclosed that GlobeTel was setting off accounts receivable related to the "off-net" program owed to its subsidiaries against liabilities related to the "off-net" program that its subsidiaries owed to their suppliers.

88.     In addition, GlobeTel's disclosures never identified Centerline's "off-net" customers or its "off-net" vendors, even though those five companies accounted for the majority of GlobeTel's revenue in 2004 and 2005. CSI purported to have done millions of dollars in off-

23

net business with Centerline even while CSI's owner, Vargas, and one of its executives, Monterosso, were agents and employees running Centerline.

89.     Commission regulations required GlobeTel to discuss its significant customers in its annual reports.  GlobeTel failed to make those required disclosures with respect to the customers involved in the "off-net" revenue program reported in its Form 10-KSB filed on March 31, 2005, and reported in its Form 10-K filed on March 31, 2006.  Jiminez signed both filings.

90.     GAAP required GlobeTel to disclose related-party transactions in its annual reports.  GlobeTel failed to make those required discloses in its Form 10-K filed on March 31, 2006, when it failed to disclose the status of Monterosso and Vargas as the principals of one of Centerline's vendors and customers at the same time they served as agents and employees of Centerline.

## H.     GLOBETEL'S MATERIALLY FALSE AND MISLEADING STATEMENTS AND DISCLOSURES

91.     As a direct result of the fraudulent scheme to create fictitious telecom revenue, GlobeTel overstated its revenue during fiscal years 2004 through 2006 by approximately $119 million – about 80 percent of all revenue recognized by GlobeTel during that period. Consequently, GlobeTel overstated its revenue in its periodic filings and registration statements filed with the Commission and in press releases.

92.     Monterosso knew or was reckless in not knowing that the invoices and CDRs were false and that the fictitious "off-net" purchases and sales he and Vargas reported to GlobeTel in the false invoices and CDRs would be recorded by GlobeTel in its books and

24

records and incorporated into the revenue reported by GlobeTel in periodic reports, registration statements and press releases.

93.     Specifically, Monterosso knew that GlobeTel's accountants would rely upon the invoices to record the revenue and would rely upon the CDRs to confirm that the invoices were true.  When GlobeTel's accountants requested the documents from Monterosso, they told him that the auditors had requested the CDRs to compare to the invoices.

94.     At the same time they knew that Monterosso's invoices were suspicious, Jimenez and Lynch made, or caused to be made, entries in GlobeTel's general ledger that recorded the revenue based upon the "off-net" invoices.  They then made, or caused to be made, entries in GlobeTel's general ledger that set off the accounts receivable against liabilities.  As a result, GlobeTel did not disclose that no one paid the invoices associated with the "off-net" revenue.

### 1.     Globetel Overstated Its Revenue In Eight Periodic Filings

95.     As a direct result of the fraudulent scheme to create and report fictitious revenue for Centerline, Volta and Lonestar, GlobeTel's annual reports for fiscal years 2004 and 2005 and its quarterly reports for the fiscal quarters ended September 30, 2004, through June 30, 2006, contained materially false and misleading statements and disclosures.

96.     Upon information and belief, the following chart describes the annual and quarterly reports filed by GlobeTel that contained false and misleading statements concerning the amount of GlobeTel's total revenue.  The chart also describes the total revenue GlobeTel reported, the amount of fictitious "off-net" revenue included in the total revenue reported, and the percentage of GlobeTel's total revenue represented by the fictitious "off-net" revenue:

| Period | Date of filing with the Commission | Total revenue GlobeTel reported | Total fictitious "off-net" revenue | Percentage of total revenue created by off-net revenue |
|---|---|---|---|---|
| Q3 2004 Form 10-QSB | Nov. 15, 2004 | $7.50 million | $3.27 million | 44% |
| **FY 2004 Form 10-KSB** | **Mar. 31, 2005** | **$28.99 million** | **$16.82 million** | 58% |
| Q1 2005 Form 10-QSB | May 16, 2005 | $18.01 million | $13.27 million | 74% |
| Q2 2005 Form 10-Q | Aug. 12, 2005 | $19.70 million | $17.03 million | 86% |
| Q3 2005 Form 10-Q | Nov. 14, 2005 | $22.29 million | $20.24 million | 91% |
| **FY 2005 Form 10-K** | **Mar. 31, 2006** | **$81.14 million** | **$63.85 million** | 79% |
| Q1 2006 Form 10-Q | May 12, 2006 | $22.29 million | $20.50 million | 92% |
| Q2 2006 Form 10-Q | Aug. 14, 2006 | $21.62 million | $18.56 million | 86% |
| **Cumulative Eight Quarters** | | **$147.06 million** | **$119.75 million** | **81%** |

97.     On June 9, 2006, GlobeTel filed amended versions of its Form 10-KSB for 2004 and its Form 10-K for 2005.  Both filings contained the statements of revenue contained in the originally filed statements and, therefore, were materially false and misleading because they included the fictitious "off-net" revenue.

98.     Upon information and belief, GlobeTel overstated its revenues in every filing, including an overstatement of 138 percent in its 2004 annual report and an overstatement of 369 percent in its 2005 annual report.  During the entire eight quarters including the first half of 2006, GlobeTel overstated its revenue by 439 percent.

26

**2.      Globetel Overstated Its Revenue In Press Releases**

99.      GlobeTel never made any significant profit from Centerline's wholesale telecom

business, but its press releases regularly touted the revenue Centerline had generated and

predicted record future revenue.  Between September 2004 and September 2006, GlobeTel

issued numerous press releases concerning its actual revenue and projected revenue.  These press

releases incorporated the fictitious "off-net" revenue created by Monterosso and Vargas.

100.      On or about September 28, 2004, GlobeTel issued a press release that stated:

GlobeTel Communication Corp. (OTCBB:GTEL), today released expected
revenues for the third quarter ending September 30, 2004 as well as a statement of
expectations for the fourth quarter.

GTEL management is pleased to announce that it is expected to report that third
quarter 2004 revenues will be in excess of $5,000,000 and that based on the third
quarter performance, GTEL will be on a $20,000,000 annual run rate.  Annual run
rate is revenue at the current rate projected over a 12-month period from that time
forward.

Management believes that, based on product acceptance, accelerated product
marketing and other positive business developments, GTEL should be generating
revenues of $4 million to $5 million per month by the end of the fourth quarter
ending December 31, 2004, producing an annual run rate of $48,000,000 to
$60,000,000.  These revenue numbers are consistent with management's previous
statements and revenue forecasts and objectives.

101.      The $5 million in quarterly revenue GlobeTel reported in the September 28, 2004,

press release for the third quarter of 2004 was overstated by about $3.27 million because those

figures included the fictitious "off-net" revenue created by Monterosso and Vargas.

102.      The "annual run rate" GlobeTel reported in the September 28, 2004, press release

was also false because it also included the fictitious "off-net" revenue created by Monterosso and

Vargas.

27

103.    On or about October 13, 2004, GlobeTel issued a press release that stated:

GlobeTel Communications Corp. (OTCBB:GTEL), today released guidance on revenues in the fourth quarter which will end December 31, 2004.

GTEL management announced that revenue in the beginning of the fourth quarter has been exceeding $900,000 per week.  The company expects the traffic to average $4,000,000 to $5,000,000 per month for the fourth quarter 2004.  If the company is successful in continuing this pattern, fourth quarter revenues will exceed $12,000,000, meeting expectations as had been announced in the prior month.

104.    The "$900,000 per week" in revenue GlobeTel reported in the October 13, 2004, press release was materially overstated because it included the fictitious "off-net" revenue created by Monterosso and Vargas.

105.    On or about March 31, 2005, GlobeTel issued a press release that stated: "GlobeTel Communications Corp. (OTCBB:GTEL), with its filing of its SEC Form 10-KSB, today announced that the Company had revenues of $28,996,213 in fiscal year 2004 resulting in a net loss of $13,166,869."

106.    As described above, GlobeTel also filed its annual report on Form 10-KSB on or about March 31, 2005.  In that report, GlobeTel reported about $29.99 million in revenue for 2004, which included about $14.48 million in revenue for the fourth quarter of 2004.

107.    The annual revenue GlobeTel reported in the March 31, 2005, press release was materially overstated by about $16.82 million for 2004 and the revenue it reported for the fourth quarter of 2004 was overstated by about $13.54 million because those figures included the fictitious "off-net" revenue created by Monterosso and Vargas.

28

108.   On or about May 16, 2005, GlobeTel issued a press release that stated:

GlobeTel Communications Corp. (OTCBB:GTEL), reported today in its filing of SEC Form 10Q [sic], that during the quarter ended March 31, 2005, the company had revenues of $18,010,643 resulting in a net loss of $3,600,054." The press release also stated that GlobeTel had about $14.48 million in revenue in the fourth quarter of 2004.

109.   The quarterly revenue GlobeTel reported in the May 16, 2005, press release was overstated by about $13.54 million for the fourth quarter of 2004 and about $13.27 million for the first quarter of 2005 because those figures included the fictitious "off-net" revenue created by Monterosso and Vargas.

110.   On or about July 12, 2005, GlobeTel issued a press release that stated:

GlobeTel Communications Corp. (AMEX:GTE) announced today its revenues for the second quarter 2005 will be in excess of $19 million with projected annual revenues in excess of $80 million." The press release also stated that GlobeTel had about $18.01 million in revenue for the first quarter of 2005 and $14.48 million in revenue in the fourth quarter of 2004.

111.   On or about August 11, 2005, GlobeTel issued a press release that stated:

GlobeTel Communications Corp. (AMEX:GTE), today reported in its filing of SEC Form 10Q that the company had revenues of $19,700,531 during the second quarter ended June 30, 2005, compared to $3,790,085 during the same period in 2004, an increase of 419%. Total revenues for the six months ended were $37,711,175, compared to $7,000,419 during the same period in 2004, an increase of 438%.

112.   The quarterly and "six-month" revenue GlobeTel reported in the July 12, 2005, and August 11, 2005, press releases were overstated by about $13.54 million for the fourth quarter of 2004, about $13.27 million for the first quarter of 2005, and about $17.03 million for the second quarter of 2005 because those figures included the fictitious "off-net" revenue created by Monterosso and Vargas.

29

113.    On or about September 23, 2005, GlobeTel issued a press release that stated:

"GlobeTel Communications Corp. (AMEX:GTE) today announced it expects to achieve record revenue of approximately $22 million for the third quarter ending September 30, 2005, an expected 193% increase from the third quarter last year."

114.    The quarterly revenue GlobeTel reported in the September 23, 2005, press release was overstated by about $20.24 million for the third quarter of 2005 because that figure included the fictitious "off-net" revenue created by Monterosso and Vargas.

115.    On or about March 31, 2006, GlobeTel issued a press release that stated:

GlobeTel Communications Corp. (AMEX: GTE) reported its results for the fiscal year ended December 31, 2005.

For the year ended December 31, 2005, GlobeTel reported gross revenues of $81,143,838, an increase of 179.8% over gross revenues of $28,996,213 for the prior year ended December 31, 2004. The revenue increase is attributed primarily to increases in wholesale carrier traffic revenues (telecommunications minutes) and related network management fees from GlobeTel Communications Corp [sic] wholly owned [sic] subsidiary, Centerline Communications and its subsidiaries. Centerline and its subsidiaries recorded consolidated revenues of $71,968, 367 (or 88.7% of total revenues).

116.    The annual revenue in the March 31, 2006, press release was overstated by about $63.85 million for 2005 because that figure included the fictitious "off-net" revenue created by Monterosso and Vargas. The description of Centerline and its subsidiaries as conducting wholesale carrier traffic business was also false in that neither Volta, Lonestar nor Centerline engaged in any wholesale telecom business.

117.    On or about May 12, 2006, GlobeTel issued a press release that stated:

GlobeTel Communications Corp. (AMEX:GTE) reported its results for the quarter ended March 31, 2006. During the quarter, the Company achieved revenue of $22,294,725, or 24% more than revenue of $18,010,643 reported for the first quarter 2005 and a 5.5% sequential rise over fourth quarter 2005 revenue of $21,133,147.

118.    The quarterly revenue GlobeTel reported in the May 12, 2006, press release was overstated by about $13.27 million in the first quarter of 2005, about $13.30 million in the fourth quarter of 2005 and about $20.50 million in the first quarter of 2006 because those figures included the fictitious "off-net" revenue created by Monterosso and Vargas.

119.    On or about August 14, 2006, GlobeTel issued a press release that began:

GlobeTel Communications Corp. (AMEX:GTE) reported results today for its fiscal second quarter, which ended June 30, 2006.

Revenues for the second quarter of fiscal 2006 were $21,628,623, an increase of 10% as compared with $19,700,531 for the second quarter of fiscal 2005, and a 2% decrease as compared with $22,294,725 for the first quarter of fiscal 2006. The year-over-year increase was driven predominantly by a proportional rise in Centerline wholesale traffic revenues (telecommunication minutes).

120.    The quarterly revenue GlobeTel reported in the August 14, 2006, press release was overstated by about $17.03 million for the second quarter of 2005, about $20.50 million for the first quarter of 2006, and about $18.56 million for the second quarter of 2006 because those figures included the fictitious "off-net" revenue created by Monterosso and Vargas.

## I.    GLOBETEL FILED EIGHT REGISTRATION STATEMENTS THAT INCORPORATED ITS FALSE FINANCIAL STATEMENTS

121.    Between December 2004 and January 2006, GlobeTel filed the following eight registrations statements with the Commission registering the sale of its common stock that were signed either by Jiminez or Lynch:

| Filing | Date | CFO Who Signed the Registration Statement | Number of Shares Registered |
|--------|------|-------------------------------------------|-----------------------------|
| Form S-8 | Dec. 15, 2004 | Jiminez | 2,696,500 |
| Form SB-2 | Feb. 3, 20005 | Jiminez | 78,874,900 |
| Form S-8 | Mar. 8, 2005 | Jiminez | 32,400,000 |

31

| Filing | Date | CFO Who Signed the Registration Statement | Number of Shares Registered |
|--------|------|-------------------------------------------|-----------------------------|
| Form S-3 | June 23, 2005 | Jiminez | 3,198,199 |
| Form S-8 | Aug. 31, 2005 | Jiminez | 204,828 |
| Form S-3 | Dec. 5, 2005 | Jiminez | 98,983 |
| Form S-8 | Jan. 4, 2006 | Jiminez | 9,999,347 |
| Form S-8 | Aug. 4, 2006 | Lynch | 185,726 |

122.    These statements registered the sale of approximately 127 million shares of GlobeTel's common stock.  All eight registration statements reported and/or incorporated by reference GlobeTel's overstated revenue and, therefore, contained materially false and misleading statements and disclosures.

123.    In addition, GlobeTel sold $1.6 million in stock in 2005 through unregistered sales made by a subsidiary.  At the time of these sales, GlobeTel's public statements about its finances were false because it had overstated revenue as described in Section H.1.

## J.    GLOBETEL'S BOOKS AND RECORDS FAILED TO PROPERLY REFLECT THE COMPANY'S REVENUE, ACCOUNTS RECEIVABLE AND LIABILITIES

124.    GlobeTel's books, records and accounts failed to properly reflect the company's transactions including, but not limited to, the following:

(a)    The "off-net" invoices and the subsequent entries in GlobeTel's general ledger falsely recorded that Centerline engaged in $119 million in sales and purchases that, in reality, did not occur.  Monterosso created or instructed Vargas to create the false invoices and CDRs and to submit them to GlobeTel's finance department knowing that they would cause GlobeTel to record revenue in its general ledger and financial statements.

32

(b)     GlobeTel's general ledger falsely recorded that the accounts receivable had been paid or otherwise settled and that GlobeTel had either paid or otherwise settled its liabilities. Jimenez and Lynch made or approved the improper general ledger entries that created those errors.

125.    The books, records and accounts that were false include, but are not limited to, the "off-net" invoices, accounts in GlobeTel's general ledgers that reflect revenue, cost of goods sold, accounts receivable and liabilities, and GlobeTel's cash flow and balance sheets that summarize the information from the general ledgers.

## K.     GLOBETEL FAILED TO IMPLEMENT CONTROLS

126.    GlobeTel was required to maintain accounting controls sufficient to provide reasonable assurances that its transactions were recorded as necessary to permit preparation of its financial statements in conformity with GAAP.

127.    From at least July 2004 until they left GlobeTel, Jiminez and Lynch were responsible for implementing GlobeTel's accounting controls. During this period they failed to implement controls sufficient to provide reasonable assurances that GlobeTel's transactions were recorded as necessary to permit preparation of its financial statements in conformity with GAAP. These failures included, but were not limited to, the following:

(a)     GlobeTel's controls were insufficient because they allowed GlobeTel to overstate its revenue based upon false invoices created by Vargas that recorded purchases and sales that never occurred. No control existed to confirm that contracts existed with customers and suppliers comprising 80 percent of the business of GlobeTel and its subsidiaries.

33

(b)      GlobeTel's lack of controls permitted Jimenez and Lynch to set off unpaid bills related to the "off-net" revenue program against each other without justifying why receivables owed by one company were set off against liabilities owed to another company, or why "off-net" customers failed to pay their bills.

## PART II – UNREGISTERED SALES OF STOCK

## L.   DURING 2003 AND 2004, GLOBETEL OBTAINED CONTROL OF AN AUSTRALIAN SHELL COMPANY

128.    Beginning in September 2003, GlobeTel entered a series of agreements with an Australian shell company, Advantage Telecom, later renamed Consolidated Global Investments ("CGI"), whereby GlobeTel took control of CGI, which became a subsidiary of GlobeTel.  The first agreement in this complex transaction was entered in September 2003 and gave GlobeTel the right to control CGI's board of directors.

129.    By June 2004, GlobeTel owned a controlling stake of CGI's stock – 73.15 percent of the outstanding stock– in return for which GlobeTel gave CGI millions of shares of GlobeTel stock.  Three of CGI's four directors were Huff, GlobeTel's chairman, Przemyslaw Kostro, and another GlobeTel executive, Leigh Coleman.  Huff and Coleman also had trading authority for CGI's brokerage account.

## M.   HUFF AND GLOBETEL CAUSED CGI TO MAKE UNREGISTERED SALES OF GLOBETEL STOCK WORTH MORE THAN $1.6 MILLION

### 1.    In 2005 GlobeTel Owed Money To CSI And Monterosso

130.    In early 2005, as a result of the $25 million in "off-net" revenue allegedly generated by Centerline, GlobeTel owed stock to CSI, the company owned by Vargas and run by Monterosso.

131.    Also, in February and April 2005, Huff negotiated contracts in which GlobeTel agreed to purchase Monterosso's Los Angeles telecom switch in return for which GlobeTel would pay Monterosso and CSI with GlobeTel stock.

## 2.    Huff And Another GlobeTel Executive Directed The Sale Of CGI's GlobeTel Stock To Pay GlobeTel's Debts To CSI And Monterosso

132.    Huff conceived a plan to have CGI sell its GlobeTel shares to satisfy GlobeTel's debt to Monterosso and CSI.  As early as mid-January 2005, Huff told Monterosso that he could not give free-trading stock directly to Monterosso, but that he would pay GlobeTel's debt by directing GlobeTel's subsidiary CGI to sell stock.

133.    Huff and Coleman then executed transactions, directing CGI's broker when and at what price to sell CGI's GlobeTel stock and where to transfer the proceeds.  In January 2005, Coleman, who was also a CGI director, instructed the broker to wire the proceeds of CGI's stock sales to a GlobeTel bank account.

134.    On three different occasions in February 2005, Huff instructed CGI's broker to sell one million (pre-split) shares of GlobeTel stock.  Huff cautioned the broker to sell slowly so as not to put "pressure on the market," and also told him that GlobeTel planned to sell three million (pre-split) shares over the next month.

135.    In late March 2005, Huff instructed CGI's broker to keep selling GlobeTel stock if he could sell it for 25 cents or more per share.

136.    In addition to instructing CGI's broker to sell GlobeTel stock, Huff repeatedly instructed him to transfer the proceeds to GlobeTel's bank account.

137.    During 2005, CGI sold a total of approximately 610,000 (post-split) shares of
GlobeTel stock.  Because some of these sales occurred before GlobeTel's 15:1 reverse split, the
actual number of shares sold into the market actually numbered in the millions.

138.    During 2005, CGI's broker transferred to GlobeTel more than $1.6 million in
proceeds from the CGI's sale of its GlobeTel stock .  Huff caused GlobeTel to use these proceeds
to pay the company's debt to CSI and Monterosso.

139.    In general, Sections 5(a) and 5(c) of the Securities Act prohibit the offer or sale of
securities in interstate commerce unless a registration statement is on file with the Commission
or an exemption from registration applies.  One exemption from registration is Section 4(1) of
the Securities Act which provides that Section 5 shall not apply to transactions by any person
other than an issuer, underwriter or dealer.  However, a subsidiary of the issuer of the securities
may not rely upon the Section 4(1) exemption to sell the securities issued by its parent because,
in this context, a parent and its subsidiary are considered the same entity.

140.    CGI purported to sell its GlobeTel shares in reliance upon the Section 4(1)
exemption based upon its compliance with the safe harbor from being considered an underwriter
in Rule 144 under the Securities Act.  However, regardless whether CGI was an underwriter, it
was considered an issuer and, therefore, could not rely upon Section 4(1) to avoid the
requirements of Sections 5(a) and 5(c).

**PART III – REPORTING VIOLATIONS**

**N.    IN 2002, GLOBETEL OVERSTATED ITS REVENUE FROM TRANSACTIONS WITH COMPANIES OWNED BY GLOBETEL EXECUTIVES AND AN AUSTRALIAN SHELL COMPANY**

141.    In early 2002, GlobeTel had less than $21,000 in cash, and its auditors issued a "going concern" opinion for its 2001 financial statements. During this same period, GlobeTel hired a stock promoter to promote the company's stock and issued two February 2002 press releases that quoted GlobeTel's chairman Przemyslaw Kostro predicting $12 million in revenue and $1.2 million in net income for 2002.

142.    GlobeTel fulfilled Kostro's prediction, primarily, through three transactions that involved private companies run by Huff, Kostro and an Australian shell company called IP World. IP World stock had been suspended from trading on the Australian Stock Exchange in 1999 and did not trade on any public market.

143.    In three 2002 transactions, GlobeTel purported to sell computer software and networks worth $8 million to IP World, including one network sold through Huff's private company. IP World paid GlobeTel for the computer networks with shares of IP World stock.

144.    At the time GlobeTel sold computer networks to IP World, GAAP provided that a company should recognize revenue when assets received are readily convertible to known amounts of cash and collectibility of such amounts is not in doubt.

145.    The cash value of IP World stock that GlobeTel received for the computer networks was not known at the time of the sale and collectibility of the purported value of the stock was in doubt. Yet, GlobeTel – in violation of GAAP – recognized $8 million in revenue

37

from all three sales to IP World. In its quarterly filings, annual filing and registration statements, GlobeTel overstated its revenue by the amount of the sales to IP World.

146.    Within weeks of reporting the third IP World "sale," GlobeTel tried to sell stock in a December 2002 offering. GlobeTel filed a Form SB-2 to register those sales, incorporating the $8 million in revenue from the IP World "sales." However, shortly thereafter GlobeTel withdrew the Form SB-2.

147.    In 2003, GlobeTel wrote off all of IP World's stock as worthless and recorded a loss of about $4.8 million. Under GAAP, that stock should never have been recorded at that value in 2002, so GlobeTel should not have recorded such a loss in 2003. As a result, GlobeTel overstated its actual net loss for 2003 by the amount that it over-valued the IP World stock.

148.    The overstatement of revenue in 2002 and the overstatement of net loss in 2003 were continued in the company's periodic filings in 2002, 2003 and 2004. On November 2, 2007, GlobeTel filed a restated Form 10-KSB for 2004 that continued to reflect the overstated loss for 2003.

## O.    IN 2004, GLOBETEL IMPROPERLY CAPITALIZED ASSETS IT PURCHASED FROM PRIVATE COMPANIES

### 1.    The Sanswire Acquisition

149.    In 2004, GlobeTel bought all the assets connected to Sanswire Technology's ("Sanswire") business of designing and building airships for $2.8 million. GlobeTel capitalized almost the entire cost of Sanswire's airship business as an intangible asset.

150.    What GlobeTel purchased from Sanswire was an "in process" research and development project. Therefore, GAAP required GlobeTel to record the entire amount it paid

38

Sanswire at the time it acquired the "in process" research and development project as an expense rather than capitalizing it as an intangible asset in the financial statements.

151.    Because GlobeTel improperly recorded the $2.8 million purchase from Sanswire as an intangible asset, it overstated its assets and understated its expenses in its quarterly and annual filings with the Commission in violation of GAAP.  In addition, GlobeTel failed to file financial statements for the Sanswire airship business as required by Form 8-K and Reg S-B.  In fact, Sanswire had no audited financial statements, and its accountants had said they could not audit the company's books.

152.    If GlobeTel had filed Sanswire's financial statements as required, a reasonable investor would have known that GlobeTel had paid $2.8 million for a business that had no revenue and whose books could not be audited.

153.    On November 2, 2007, GlobeTel filed a restated Form 10-KSB for 2004 that reduced its assets and increased its net loss by $2.778 million because it had not properly accounted for the Sanswire transaction in its original filing.

**2.    The Hotzone Acquisition**

154.    In 2005, GlobeTel bought all the assets of a private company, Hotzone, related to Hotzone's business of creating wireless networks for $7.1 million.  GlobeTel capitalized almost the entire cost of Hotzone's wireless network business as an intangible asset.  This asset was, in actuality, an "in process" research and development project.  Therefore, proper accounting under GAAP required that GlobeTel record the entire amount it paid Hotzone at the time it acquired the "in process" research and development project as an expense rather than capitalizing it as an intangible asset in the f.

155.   As a result of failing to properly account for the Hotzone transaction, GlobeTel overstated its assets and understated its expenses in its quarterly and annual filings with the Commission, in violation of GAAP.

156.   In addition, GlobeTel failed to file financial statements for the Hotzone wireless business as required by Form 8-K and Reg S-B.  In fact, Hotzone had no audited financial statements.  If GlobeTel had filed Hotzone's financial statements as required, investors would have known that GlobeTel had paid $7.1 million for a business that had no revenue and no audited financial statements.

157.   On December 5, 2007, GlobeTel filed a restated Form 10-K for 2005 that reduced its assets and increased its net loss by $7,129,550, because it had not properly accounted for the Hotzone transaction in its original filing.

## P.   IN 2005, GLOBETEL FAILED TO DISCLOSE THAT IT HAD HIRED STEVEN KING AS ITS PRESIDENT

158.   In November 2005, GlobeTel hired as its president, Steven King, who was subject to a permanent anti-fraud injunction issued by the District Court for the Middle District of Florida on January 20, 2000.

159.   The securities laws require a company to file a Form 8-K disclosing the hiring of a president within four business days of the hiring.  GlobeTel never filed a Form 8-K to disclose the hiring of King.

160.   About a month after King was hired, Huff removed King as president.  The securities laws require a company to file a Form 8-K disclosing the removal of a president within four business days of the removal.  GlobeTel never filed a Form 8-K to disclose King's removal.

40

Q.    **IN MARCH 2006, FILED AN ANNUAL REPORT THAT FAILED TO DISCLOSE THAT JIMINEZ AND HUFF HAD DISPOSED OF GLOBETEL STOCK**

   1.    **Huff And Jimenez Cashed In GlobeTel Stock Worth Millions of Dollars By Obtaining Non-Recourse Loans Secured By The Stock**

   161.    In early 2005, Huff obtained loans totaling $2.17 million as a result of two non-recourse loans for which he pledged about 643,000 (post-split) GlobeTel shares as the only collateral.  One of these loans was a $1.77 million loan from Argyll Equities ("Argyll").  At the same time, Jimenez obtained $991,965 by obtaining a similar loan from Argyll and delivering about 280,000 (post-split) GlobeTel shares as collateral.  Under the terms of the loans it gave to Huff and Jiminez, Argyll had the right to sell the GlobeTel stock pledged as collateral if the loans went into default.

   162.    The amount of the loans that both Huff and Jiminez received was directly based upon the then-current market price for GlobeTel's stock.

   2.    **In 2005, Jimenez Caused Globetel To File A False Annual Report That Concealed That He And Huff Had Defaulted On Their Loans**

   163.    In July 2005, Argyll declared the loans to Jiminez and Huff to be in default because GlobeTel's share price had dropped and because both individuals had stopped paying interest on their loans.

   164.    Huff's and Jiminez's loans were in default at least until April 2006 when Jimenez and Huff signed amendments and agreed to pay the back interest due on them.  The amendments were signed after the end of GlobeTel's 2005 fiscal year and after the March 31, 2006, filing date of GlobeTel's Form 10-K.

165.    The Form 10-K requires a company to disclose the amount of stock beneficially owned by its officers, including its CEO and CFO.  The Form 10-K also requires a company to disclose material events and material contingencies that occur between the end of the fiscal year and the filing of its annual report.

166.    When GlobeTel filed its annual report for 2005, Jimenez caused GlobeTel to overstate by more than 25 percent the amount of stock owned by its CEO Huff and its CFO Jimenez because GlobeTel did not disclose that Jiminez and Huff had defaulted upon their loans and lost control of more than one-quarter of the shares that they each claimed to own – 643,000 of 2.44 million (post-split) shares and 280,000 of 934,369 (post-split) shares respectively.

167.    Because Huff's and Jiminez's loan defaults were never disclosed, GlobeTel's Form 10-K for 2005 made it appear to investors that GlobeTel's executives were holding all their stock when, in truth, Huff and Jimenez had cashed out a significant amount of their stock.

**R.    GLOBETEL NEVER DISCLOSED THAT IN OR ABOUT JULY 2006,
MONTEROSSO BEGAN SERVING AS GLOBETEL'S COO**

168.    In or about July 2006, Huff hired Monterosso to serve as GlobeTel's COO.  From that date forward, Monterosso held himself out as the COO, including in communications with AMEX's chief regulatory officer.

169.    The securities laws require a company to file a Form 8-K disclosing the hiring of a COO within four days of the hiring.  GlobeTel did not file a Form 8-K disclosing that Monterosso was hired as COO until November 17, 2006.

## FIRST CLAIM FOR RELIEF
### (Jimenez and Lynch)
### (Violations of Section 17(a) of the Securities Act)

170.    Paragraphs 1 through 169 are realleged and incorporated herein by reference.

171.    As described above, Jimenez and Lynch directly or indirectly, in the offer or sale of GlobeTel securities, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, knowingly, recklessly or negligently:

(a)    employed devices, schemes or artifices to defraud;

(b)    obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)    engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of GlobeTel securities.

172.    The scheme of Jimenez and Lynch included, among others, the following fraudulent acts, untrue statements of material fact and material omissions:

(a)    From about September 2004 until each man left the company, Jimenez and Lynch made or caused to be made entries in GlobeTel's general ledger based on the "off-net" invoices that caused GlobeTel to record and report $119 million in revenue and cost of goods sold. These allegations are described in the paragraphs in Sections A through F, above.

(b)    From about September 2004 until each man left the company, Jimenez and Lynch knew that no one had paid the "off-net" invoices that GlobeTel used as the basis for recording millions of dollars in revenue. They knew that GlobeTel had millions of

43

dollars in accounts receivable and liabilities on its books at the end of each quarter. These allegations are described in the paragraphs in Section E, above.

(c)     From about September 2004 until each man left the company, Jimenez and Lynch made or approved entries in GlobeTel's general ledger that eliminated the accounts receivable and liabilities caused by the "off-net" revenue program. They had no basis for making the entries, and the entries were inconsistent with GAAP. These allegations are described in the paragraphs in Section E, above.

(d)     The offsetting entries made or approved by Jimenez and Lynch concealed from investors that neither GlobeTel's subsidiaries nor its subsidiaries' customers were paying the millions of dollars in bills associated with the "off-net" transactions. These allegations are described in the paragraphs in Section E, above.

(e)     Jimenez and Lynch made or approved the off-setting journal entries even while they were aware of red flags that – at a minimum – alerted them that the invoices Monterosso and Vargas were submitting did not represent actual telecom business conducted by Centerline. They knew that: 1) GlobeTel and its subsidiaries did not pay the invoices or get paid; 2) Monterosso and Vargas created invoices and revenue after the close of a quarter; 3) Monterosso and Vargas provided "off-net" invoices at the end of each quarter rather that at the time of the transaction as they did with the CSI's normal business; 4) Monterosso said he was paying other companies for invoices and CDRs; 5) the "off-net" transactions occurred even while GlobeTel's telecom switch was disassembled; and 6) the "off-net" revenue was treated separately from GlobeTel's other business. These allegations are described in the paragraphs in Section F above.

173.    The fraudulent acts, untrue statements of material fact and material omissions of Jimenez and Lynch directly caused the following materially false and misleading statements of fact which operated, or would have operated, as a fraud or deceit upon purchasers of GlobeTel securities:

(a)    Between October 2004 and September 2006, GlobeTel's annual reports for fiscal years 2004 and 2005, and its quarterly reports for the fiscal quarters ended September 30, 2004, through June 30, 2006, contained materially false and misleading statements and disclosures, as described in the paragraphs in Section H.1., above.

(b)    Between September 2004 and September 2006, GlobeTel issued numerous press releases concerning its actual revenue and projected revenue that contained materially false and misleading statements and disclosures, as described in the paragraphs in Section H.2., above.

(c)    Between December 2004 and January 2006, GlobeTel filed eight registration statements with the Commission that registered the sale of approximately 127 million shares of GlobeTel stock.  All eight registration statements included and/or incorporated by reference the materially false and misleading statements concerning GlobeTel's revenue and cost of goods sold from GlobeTel's quarterly and annual reports.  In addition, GlobeTel made $1.6 million as the result of unregistered sales of stock.  These allegations are described in the paragraphs in Section I, above.

174.    By engaging in the conduct alleged, defendants Jimenez and Lynch violated, and unless enjoined will continue to violate,  Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

45

## SECOND CLAIM FOR RELIEF
### (Jimenez and Lynch)
### (Direct Violations of Section 10(b) of the Exchange Act and Rule 10b-5)

175.    Paragraphs 1 through 174 are realleged and incorporated herein by reference.

176.    As described above, Jimenez and Lynch, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, knowingly or recklessly:

(a)     employed devices, schemes or artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

177.    The scheme of Jimenez and Lynch included, among others, the following fraudulent acts, untrue statements of material fact and material omissions:

(a)     From about September 2004 until each man left the company, Jimenez and Lynch made or caused to be made entries in GlobeTel's general ledger based on the "off-net" invoices that caused GlobeTel to record and report $119 million in revenue and cost of goods sold.  These allegations are described in the paragraphs in Sections A through F, above.

(b)     From about September 2004 until each man left the company, Jimenez and Lynch knew that no one had paid the "off-net" invoices that GlobeTel had used as the

46

basis for recording millions of dollars in revenue. They knew that GlobeTel had millions of dollars in accounts receivable and liabilities on its books at the end of each quarter. These allegations are described in the paragraphs in Section E, above.

(c)     From about September 2004 until each man left the company, Jimenez and Lynch made or approved entries in GlobeTel's general ledger that eliminated the accounts receivable and liabilities caused by the "off-net" revenue program. They had no basis for making the entries and the entries were inconsistent with GAAP. These allegations are described in the paragraphs in Section E, above.

(d)     The offsetting entries made or approved by Jimenez and Lynch concealed from investors that neither GlobeTel's subsidiaries nor its subsidiaries' customers were paying the millions of dollars in bills associated with the "off-net" transactions. These allegations are described in the paragraphs in Section E, above.

(e)     Jimenez and Lynch made or approved the offsetting journal entries even while they were aware of red flags that – at a minimum – alerted them that the invoices Monterosso and Vargas were submitting did not represent actual telecom business conducted by Centerline. They knew that: 1) GlobeTel did not pay the invoices or get paid; 2) Monterosso and Vargas created invoices and revenue after a quarter closed; 3) Monterosso and Vargas provided "off-net" invoices at the end of each quarter rather that at the time of the transaction as they did with the company's normal business; 4) Monterosso said he was paying other companies for invoices and CDRs; 5) the "off-net" transactions occurred even while GlobeTel's switch was disassembled; and 6) the "off-

47

net" revenue was treated separately from GlobeTel's other business.  These allegations are described in the paragraphs in Section F above.

178.    The fraudulent acts, untrue statements of material fact and material omissions of Jimenez and Lynch directly caused the following materially false and misleading statements of fact which operated, or would have operated, as a fraud or deceit upon purchasers of GlobeTel securities:

(a)    Between October 2004 and September 2006, GlobeTel's annual reports for fiscal years 2004 and 2005, and its quarterly reports for the fiscal quarters ended September 30, 2004, through June 30, 2006, contained materially false and misleading statements and disclosures, as described in the paragraphs in Section H.1., above.

(b)    Between September 2004 and September 2006, GlobeTel issued numerous press releases concerning its actual revenue and projected revenue that contained materially false and misleading statements and disclosures, as described in the paragraphs in Section H.2., above.

(c)    Between December 2004 and January 2006, GlobeTel filed eight registration statements with the Commission that registered the sale of approximately 127 million shares of GlobeTel stock.  All eight registration statements included and/or incorporated by reference the materially false and misleading statements concerning GlobeTel's revenue and cost of goods sold from GlobeTel's quarterly and annual reports. In addition, GlobeTel made $1.6 million as the result of unregistered sales of stock. These allegations are described in the paragraphs in Section I, above.

179.    By reason of the foregoing, Defendants Jimenez and Lynch violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
### (Jimenez and Lynch)
### (Aiding or Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5)

180.    Paragraphs 1 through 179 are realleged and incorporated herein by reference.

181.    Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] provides that any person that knowingly provides substantial assistance to another person in violation of a provision of the Exchange Act, or any rule or regulation thereunder, shall be deemed to be in violation of such provision to the same extent as the person to who such assistance is provided.

182.    As described above, from about September 2004 until each man left GlobeTel, defendants Jimenez and Lynch knowingly provided substantial assistance to GlobeTel's violation of Section 10(b) and Rule 10b-5 thereunder by making or approving entries in GlobeTel's general ledger that eliminated the accounts receivable and liabilities caused by the "off-net" revenue program.   Their efforts included:

(a)    From about September 2004 until each man left the company, Jimenez and Lynch made or caused to be made entries in GlobeTel's general ledger based on the "off-net" invoices that caused GlobeTel to record and report $119 million in revenue and cost of goods sold.  These allegations are described in the paragraphs in Sections A through F, above.

(b)     From about September 2004 until each man left the company, Jimenez and Lynch knew that no one had paid the "off-net" invoices that GlobeTel had used as the basis for recording millions of dollars in revenue. They knew that GlobeTel had millions of dollars in accounts receivable and liabilities on its books at the end of each quarter. These allegations are described in the paragraphs in Section E, above.

(c)     From about September 2004 until each man left the company, Jimenez and Lynch made or approved entries in GlobeTel's general ledger that eliminated the accounts receivable and liabilities caused by the "off-net" revenue program. They had no basis for making the entries and the entries were inconsistent with GAAP. These allegations are described in the paragraphs in Section E, above.

(d)     The offsetting entries made or approved by Jimenez and Lynch concealed from investors that neither GlobeTel's subsidiaries nor its subsidiaries' customers were paying the millions of dollars in bills associated with the "off-net" transactions. These allegations are described in the paragraphs in Section E, above.

(e)     Jimenez and Lynch made or approved the offsetting journal entries even while they were aware of red flags that – at a minimum – alerted them that the invoices Monterosso and Vargas were submitting did not represent actual telecom business conducted by Centerline. They knew that: 1) GlobeTel did not pay the invoices or get paid; 2) Monterosso and Vargas created invoices and revenue after a quarter closed; 3) Monterosso and Vargas provided "off-net" invoices at the end of each quarter rather that at the time of the transaction as they did with the company's normal business; 4) Monterosso said he was paying other companies for invoices and CDRs; 5) the "off-net" transactions

50

occurred even while GlobeTel's switch was disassembled; and 6) the "off-net" revenue was treated separately from GlobeTel's other business. These allegations are described in the paragraphs in Section F above.

183.    The fraudulent scheme of Lynch and Jiminez permitted GlobeTel to make, among others, the following materially false and misleading statements of fact which operated, or would have operated, as a fraud or deceit upon other persons, in connection with the purchase or sale of GlobeTel's securities:

    (a)    Between October 2004 and September 2006, GlobeTel's annual reports for fiscal years 2004 and 2005, and its quarterly reports for the fiscal quarters ended September 30, 2004, through June 30, 2006, contained materially false and misleading statements and disclosures, as described in the paragraphs in Section H.1., above.

    (b)    Between September 2004 and September 2006, GlobeTel issued numerous press releases concerning its actual revenue and projected revenue that contained materially false and misleading statements and disclosures, as described in the paragraphs in Section H.2., above.

    (c)    Between December 2004 and January 2006, GlobeTel filed eight registration statements with the Commission that registered the sale of approximately 127 million shares of GlobeTel stock. All eight registration statements included and/or incorporated by reference the materially false and misleading statements concerning GlobeTel's revenue and cost of goods sold from GlobeTel's quarterly and annual reports. In addition, GlobeTel made $1.6 million as the result of unregistered sales of stock. These allegations are described in the paragraphs in Section I, above.

184.    By reason of the foregoing, Defendants Jimenez and Lynch aided and abetted GlobeTel's violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### FOURTH CLAIM FOR RELIEF
### (GlobeTel)
### (Violations of Section 17(a) of the Securities Act)

185.    Paragraphs 1 through 184 are realleged and incorporated herein by reference.

186.    GlobeTel is liable for the actions of its officers and employees, including Jimenez, Lynch and Monterosso.  Jimenez and Lynch violated Section 17(a) of the Securities Act as described in the First Claim For Relief, above, which is incorporated by reference.  In addition, Monterosso violated Section 17(a).

187.    As described above, Monterosso and Vargas at Monterosso's direction, directly or indirectly, in the offer or sale of GlobeTel securities, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, knowingly, recklessly or negligently:

(a)    employed devices, schemes or artifices to defraud;

(b)    obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)    engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of GlobeTel securities.

188.    Monterosso's scheme included, among others, the following fraudulent acts, untrue statements of material fact and material omissions:

(a)     Between September 2004 and July 2006, Monterosso and Vargas, at Monterosso's direction, engaged in fraudulent acts by creating or obtaining fake invoices and CDRs that created the false appearance that Centerline, Volta and Lonestar had generated $119 million in "off-net" revenue by buying and selling "minutes" to other wholesale telecom companies, as discussed in the paragraphs in Sections A through D, above.

(b)     Between September 2004 and July 2006, Monterosso and Vargas, at Monterosso's direction, engaged in fraudulent acts and made material misstatements of fact by submitting the fake invoices and corresponding CDRs to GlobeTel, its accountants and auditors knowing that the invoices and CDRs did not represent business activity actually conducted by Centerline, Volta and Lonestar.  Monterosso knew that the invoices and CDRs would be used by GlobeTel to record in the company's books and records that Centerline, Volta and Lonestar generated millions of dollars in revenue and, consequently, would be incorporated into GlobeTel's reports of revenue generated by the company and its wholly owned subsidiaries.  These allegations are discussed in the paragraphs in Sections C and D, above.

189.    The fraudulent acts, untrue statements of material fact and material omissions of Monterosso and Vargas directly caused the following materially false and misleading statements of fact which operated, or would have operated, as a fraud or deceit upon purchasers of GlobeTel securities:

(a)     Between October 2004 and September 2006, GlobeTel's annual reports for fiscal years 2004 and 2005, and its quarterly reports for the fiscal quarters ended

September 30, 2004, through June 30, 2006, contained materially false and misleading statements and disclosures, as described in the paragraphs in Section H.1., above.

(b)     Between September 2004 and September 2006, GlobeTel issued numerous press releases concerning its actual revenue and projected revenue that contained materially false and misleading statements and disclosures, as described in the paragraphs in Section H.2., above.

(c)     Between December 2004 and January 2006, GlobeTel filed eight registration statements with the Commission that registered the sale of approximately 127 million shares of GlobeTel stock. All eight registration statements included and/or incorporated by reference the materially false and misleading statements concerning GlobeTel's revenue and cost of goods sold from GlobeTel's quarterly and annual reports. In addition, GlobeTel made $1.6 million as the result of unregistered sales of stock. These allegations are described in the paragraphs in Section I, above.

190.    By reason of the foregoing, GlobeTel violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### FIFTH CLAIM FOR RELIEF
### (GlobeTel)
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5)

191.    Paragraphs 1 through 190 are realleged and incorporated herein by reference.

192.    GlobeTel is liable for the actions of its officers and employees, including Jimenez, Lynch and Monterosso. Jimenez and Lynch violated Section 10(b) of the Exchange Act and Rule 10b-5 as described in the Second Claim For Relief, above, which is incorporated by reference. In addition, Monterosso violated Section 10(b) and Rule 10b-5.

193.   As described above, Monterosso, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, knowingly or recklessly:

(a)   employed devices, schemes or artifices to defraud;

(b)   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)   engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

194.   Monterosso's scheme included, among others, the following fraudulent acts, untrue statements of material fact and material omissions:

(a)   Between September 2004 and July 2006, Monterosso and Vargas, at Monterosso's direction, engaged in fraudulent acts by creating or obtaining fake invoices and CDRs that created the false appearance that Centerline, Volta and Lonestar had generated $119 million in "off-net" revenue by buying and selling "minutes" to other wholesale telecom companies, as discussed in the paragraphs in Sections A through D, above.

(b)   Between September 2004 and July 2006, Monterosso and Vargas, at Monterosso's direction,  engaged in fraudulent acts and made material misstatements of fact by submitting the fake invoices and corresponding CDRs to GlobeTel, its accountants and auditors knowing that the invoices and CDRs did not represent business activity actually conducted by Centerline, Volta and Lonestar.  Monterosso knew that the invoices

55

and CDRs would be used by GlobeTel to record in the company's books and records that Centerline, Volta and Lonestar generated millions of dollars in revenue and, consequently, would be incorporated into GlobeTel's reports of revenue generated by the company and its wholly owned subsidiaries. These allegations are discussed in the paragraphs in Sections C and D, above.

195.    The fraudulent acts, untrue statements of material fact and material omissions of Monterosso and Vargas directly caused the following materially false and misleading statements of fact which operated, or would have operated, as a fraud or deceit upon purchasers of GlobeTel securities:

(a)    Between October 2004 and September 2006, GlobeTel's annual reports for fiscal years 2004 and 2005, and its quarterly reports for the fiscal quarters ended September 30, 2004, through June 30, 2006, contained materially false and misleading statements and disclosures, as described in Section H.1., above.

(b)    Between September 2004 and September 2006, GlobeTel issued numerous press releases concerning its actual revenue and projected revenue that contained materially false and misleading statements and disclosures, as described in Section H.2., above.

(c)    Between December 2004 and January 2006, GlobeTel filed eight registration statements with the Commission that registered the sale of approximately 127 million shares of GlobeTel stock. All eight registration statements included and/or incorporated by reference the materially false and misleading statements concerning

GlobeTel's revenue and cost of goods sold from GlobeTel's quarterly and annual reports.
These allegations are described in the paragraphs in Section I, above.

196.     By reason of the foregoing, GlobeTel violated and, unless permanently enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SIXTH CLAIM FOR RELIEF
### (GlobeTel and Huff)
### (Violations of Sections 5(a) and 5(c) of the Securities Act)

197.     Paragraphs 1 through 196 are realleged and incorporated herein by reference.

198.     Defendants GlobeTel and Huff, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer and sell a security when no registration statement was in effect as to the security or carried or caused to be carried through the mails or in interstate commerce such security for the purpose of sale or for delivery after sale, as described in the paragraphs in Sections L and M, above.

199.     By reason of the foregoing, GlobeTel and Huff violated and, unless permanently enjoined, will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e].

## SEVENTH CLAIM FOR RELIEF
### (GlobeTel, Jimenez and Lynch)
### (Direct and Aiding and Abetting Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13)

200.     Paragraphs 1 through 199 are realleged and incorporated by reference.

201.     GlobeTel filed periodic reports with the SEC as described above that contained untrue statements of material fact or omitted to state material facts required to be stated therein or

necessary to make the statements made not misleading. Those untrue statements or omitted material facts include:

(a)     the untrue statements about revenue and cost of goods sold and the omissions about unpaid "off-net" invoices related to the "off-net" transactions and the offsetting entries as described in the paragraphs in Sections H.1. above;

(b)     the omitted material facts about the significant customers and related-party transactions as described in the paragraphs in Section G, above; and

(c)     the untrue statements and omitted material facts as described in the paragraphs in Sections N through R, above.

202.     Jimenez and Lynch knowingly provided substantial assistance to GlobeTel's untrue statements about revenue and cost of goods sold and the omissions about unpaid "off-net" invoices related to the "off-net" transactions and the offsetting entries as described in the paragraphs in Sections E, and H.1., above.

203.     By reason of the foregoing, Defendant GlobeTel violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder [17 C.F.R §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13], and unless permanently enjoined will continue to violate those sections.

204.     By reason of the foregoing, Defendants Jimenez and Lynch aided and abetted GlobeTel's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R §§ 240.12b-20, 240.13a-1, and 240.13a-13] in connection with the "off-net" transactions and the offsetting entries. Unless permanently enjoined, they will continue to violate those sections.

## EIGHTH CLAIM FOR RELIEF
### (GlobeTel, Jimenez and Lynch)
### (Direct and Aiding and Abetting Violations of Sections 13(b)(2)(A) of the Exchange Act)

205.    Paragraphs 1 through 204 are realleged and incorporated by reference.

206.    From 2004 through 2006, GlobeTel maintained false and misleading books and records that failed, in reasonable detail, to accurately and fairly reflect the transactions and dispositions of its assets as described in the paragraphs in Section J, above.

207.    Defendants Jimenez and Lynch, as set forth above, substantially assisted GlobeTel's failure to fail to make and keep the required books and records, as described in the paragraphs in Sections E, F and J, above.

208.    By reason of the foregoing, Defendant GlobeTel violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] and unless permanently enjoined will continue to violate those sections.

209.    By reason of the foregoing, Defendants Jimenez and Lynch aided and abetted GlobeTel's violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] and unless permanently enjoined will continue to violate those sections.

## NINTH CLAIM FOR RELIEF
### (GlobeTel, Jimenez and Lynch)
### (Direct and Aiding and Abetting Violations of Sections 13(b)(2)(B) of the Exchange Act)

210.    Paragraphs 1 through 209 are realleged and incorporated by reference.

211.    GlobeTel failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that its transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP, as described in the paragraphs in Section K, above.  Defendants Jimenez and Lynch substantially assisted GlobeTel's

failure to devise and maintain the required controls, as described in the paragraphs in Section K, above.

212.    By reason of the foregoing,  GlobeTel violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)], and unless permanently enjoined will continue to violate those sections.

213.    By reason of the foregoing, Jimenez and Lynch aided and abetted GlobeTel's violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)], and unless permanently enjoined will continue to violate those sections.

**TENTH CLAIM FOR RELIEF**
**(Jimenez and Lynch)**
**(Direct Violations of Exchange Act Rule 13a-14)**

214.    Paragraphs 1 through 213 are realleged and incorporated by reference.

215.    Jiminez signed false certifications in four of GlobeTel's quarterly reports and two of GlobeTel's annual reports.  Among other things, Jiminez certified that he had reviewed each of these reports and, based on his knowledge, these reports, (I) did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading and (ii) included financial statements and other financial information which fairly presented, in all material respects, GlobeTel's financial condition, results of operations and cash flows.  These representations were false, as Jiminez knew that the filings contained material misstatements and omissions concerning the amount of revenue generated by Centerline and its subsidiaries, the amount of Centerline's cost of goods, and that Centerline's revenue was the product of "partner agreements" with other telecom companies, as described in Sections E, G and H, above.

216. Lynch signed false certifications in two of GlobeTel's quarterly reports. Among other things, Lynch certified that he had reviewed each of these reports and, based on his knowledge, these reports, (I) did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading and (ii) included financial statements and other financial information which fairly presented, in all material respects, GlobeTel's financial condition, results of operations and cash flows. These representations were false, as Lynch knew that the filings contained material misstatements and omissions concerning the amount of revenue generated by Centerline and its subsidiaries and the amount of Centerline's cost of goods, as described in Sections E, G and H, above.

217. By reason of the foregoing, Defendants Jimenez and Lynch each violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14] and unless permanently enjoined will continue to violate those sections.

## ELEVENTH CLAIM FOR RELIEF
### (Jimenez and Lynch)
### (Direct Violations of Exchange Act Rule 13b2-1)

218. Paragraphs 1 through 217 are realleged and incorporated by reference.

219. Defendants Jimenez and Lynch, as set forth above, directly or indirectly, falsified or caused to be falsified, GlobeTel's books, records or accounts subject to Section 13(b)(2)(A) of the Exchange Act by directly or indirectly causing entries in the general ledger that offset the accounts receivable and liabilities. Those entries are described, in part, in the paragraphs in Section J. The effect of those entries are described, in part, in the paragraphs in Sections E, H and J, above.

220.    By reason of the foregoing, Defendants Jimenez and Lynch each violated Exchange Act Rule 13b2-1 [17 C.F.R. §§ 240.13b2-1] and unless permanently enjoined will continue to violate those sections.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

(a)    permanently enjoining defendant GlobeTel, and its agents, servants, employees, attorneys, and those in active concert or participation with them, who receive actual notice by personal service or otherwise, from (I) violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; (ii) violating Section 10(b) of the Exchange Act [15 U.S.C §§ 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder; (iii) violating Section 5 of the Securities Act [15 U.S.C. §§ 77e]; (iv) violating Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 promulgated thereunder [17 C.F.R. § 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13 and 240.13a-14]; (v) violating Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)]; and (vi) violating Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

(b)    permanently enjoining defendant Huff, and his agents, servants, employees, attorneys, and those in active concert or participation with them, who receive actual notice by personal service or otherwise, from violating Section 5 of the Securities Act [15 U.S.C. §§ 77e].

(c)    permanently enjoining defendant Jimenez, and his agents, servants, employees, attorneys, and those in active concert or participation with them, who receive actual notice by personal service or otherwise, from (I) violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; (ii) violating Section 10(b) of the Exchange Act [15 U.S.C §§ 78j(b)] and Rule 10b-5 [17

C.F.R. § 240.10b-5] promulgated thereunder; (iii) violating Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 promulgated thereunder [17 C.F.R. § 240.12b-20, 240.13a-1, and 240.13a-13]; (iv) violating Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)]; (v) violating Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)]; (vi) violating Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14]; and (vii) violating Exchange Act Rule 13b2-1 [17 C.F.R. §§ 240.13b2-1].

(d)     permanently enjoining defendant Lynch, and his agents, servants, employees, attorneys, and those in active concert or participation with them, who receive actual notice by personal service or otherwise, from (I) violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; (ii) violating Section 10(b) of the Exchange Act [15 U.S.C § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder; (iii) violating Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 promulgated thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13]; (iv) violating Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)]; (v) violating Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)]; (vi) violating Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14]; and (vii) violating Exchange Act Rule 13b2-1 [17 C.F.R. §§ 240.13b2-1].

(e)     ordering defendants GlobeTel and Jimenez to disgorge all profits that resulted from violations of the federal securities, along with prejudgment interest;

(f)     ordering defendants GlobeTel, Huff, Jimenez and Lynch to pay civil money penalties pursuant to Section 24 of the Securities Act [15 U.S.C. § 77x] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(g)     permanently barring defendant Jimenez and barring defendant Lynch for a period of five years from serving as an officer or director of a publicly traded company pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]; and

(h)     granting such other relief as this Court may deem just and appropriate.

64

April 30, 2008

Of Counsel:
Cheryl J. Scarboro

Respectfully submitted,

Jeffery T. Infelise (DC 546998)
Special Florida Bar No. A5501154
infelisej@sec.gov

Reid A. Muoio
Special Florida Bar No. A5501160
muoior@sec.gov

Brent Mitchell
Special Florida Bar No. A5501159
mitchellb@sec.gov

100 F Street NE
Washington, D.C. 20549
(tel) (202) 551-4904 (Infelise)
(fax) (202) 772-9362 (Infelise)

Attorneys for Plaintiff,
Securities and Exchange Commission

%JS 44   (Rev. 11/05)

# CIVIL COVER SHEET

## 08 - 60647

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

**I. (a) PLAINTIFFS**

Securities and Exchange Commission

**DEFENDANTS**   CIV-MARTINEZ BROWN

GlobeTel Communications, Corp., Timothy J. Huff, Thomas Y. Jimenez, and Lawrence E. Lynch

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Broward
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Jeffery T. Infelise
U.S. Securities & Exchange Commission
100 F Street NE; Washington, DC  20759-4010; (202) 551-4904

Attorneys (If Known)

(See Attachment)

0:08cv60647 Sem/STB

(d) Check County Where Action Arose:  ☐ MIAMI- DADE  ☐ MONROE  ☑ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE  HIGHLANDS

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☑ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

FILED BY _____

MAY - 2008

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)   and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product    Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability / ☐ 365 Personal Injury - |    of Property 21 USC 881 |  | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &    Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
|    & Enforcement of Judgment | Slander / ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'    Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent |    Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability    Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
|    Student Loans | ☐ 340 Marine    Safety/Health |  |  | ☐ 490 Cable/Sat TV |
|    (Excl. Veterans) | ☐ 345 Marine Product | ☐ 690 Other |  | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☑ 850 Securities/Commodities/ |
|    of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) |    Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle / ☐ 371 Truth in Lending |    Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability / ☐ 380 Other Personal | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) |    12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal    Property Damage | ☐ 730 Labor/Mgmt. Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury / ☐ 385 Property Damage    & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS**    Product Liability | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 510 Motions to Vacate | ☐ 791 Empl. Ret. Inc. |    or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/    Sentence | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | **Habeas Corpus:** | 26 USC 7609 |    Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare / ☐ 530 General |  | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - / ☐ 535 Death Penalty |  |    Under Equal Access |
|  | Employment / ☐ 540 Mandamus & Other |  |    to Justice |
|  | ☐ 446 Amer. w/Disabilities - / ☐ 550 Civil Rights |  | ☐ 950 Constitutionality of |
|  | Other / ☐ 555 Prison Condition |  |    State Statutes |
|  | ☐ 440 Other Civil Rights |  |  |

**V. ORIGIN** (Place an "X" in One Box Only)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Re-filed- (see VI below)  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. RELATED/RE-FILED CASE(S).**
(See instructions second page):

a) Re-filed Case ☐ YES ☑ NO   b) Related Cases ☐ YES ☐ NO

JUDGE Joan A. Lenard   DOCKET NUMBER 0:07-cv-61693

**VII. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

15 U.S.C. section 77q and sections 78j, t and m.  Violations of the Securities Act of 1933 and the Securities Exchange Act of 1934

LENGTH OF TRIAL via 30 days estimated for (both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND: ☐ Yes ☑ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD   _Jeffery T. Infelise_

DATE  4/30/2008

**FOR OFFICE USE ONLY**

AMOUNT _____   RECEIPT # _____   IFP _____

## **ATTACHMENT**
## **ATTORNEYS FOR DEFENDANTS**

*Attorney for GlobeTel Communications, Corp.*
Sameer Rastogi
Sichenzia Ross Friedman Ference LLP
61 Broadway, 32nd Floor
New York, New York 10006
212-930-9700

*Attorney for Timothy J. Huff*
Allan M. Lerner, Esq.
Law Offices of Allan M. Lerner
2888 East Oakland Park Boulevard
Fort Lauderdale, FL  33306

*Attorney for Lawrence Lynch*
Marc Rowin, Esq.
Lynch Rowin LLP
630 Third Avenue
New York, New York 10017

*Attorney for Thomas Jimenez*
Chris Bruno, Esq.
Bruno and Degenhardt
10615 Judicial Drive, Suite 703
Fairfax, VA  22030